IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOHN WILLIAM PACHECO,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:09-cr-055 CW<br><br>Judge Clark Waddoups |

## INTRODUCTION

Defendant John William Pacheco ("Pacheco") moves the court to suppress all evidence obtained from an interrogation following Pacheco's arrest. Pacheco asserts he did not knowingly waive his rights because he did not receive a proper Miranda warning prior to making inculpatory statements. He further asserts that Detective Daniel Wendelboth ("Wendelboth") made promises and threats that overbore his will. Consequently, Pacheco contends his confession was not voluntary and must be suppressed. The court concludes that the Miranda warning was sufficient to warn Pacheco of his rights. The court further concludes, however, that Detective Wendelboth's interrogation sufficiently overbore Pacheco's will that his confession to Detective Wendelboth was involuntary. The court therefore grants in part and denies in part the motion to suppress.

## BACKGROUND

From September 2008 through January 2009, twelve armed robberies occurred that were

similar in nature.[1] Two men robbed banks and a few other businesses.[2] A police task force developed information that Kenneth Zinda ("Zinda") may have been involved in the robberies. On January 17, 2009, the task force had Zinda under surveillance and watched him and another man exit a car and enter a magazine store at about 9:30 p.m.[3] Unbeknownst to the task force until shortly thereafter, the two men robbed the magazine store while they were there.[4] After the men exited the store, they drove to a nearby apartment complex, switched to Zinda's truck, and drove to Pacheco's residence.[5] The task force followed the men to Pacheco's residence and quietly surrounded the house for several hours while the task force obtained a search warrant and positioned the SWAT team.

At about 3:00 a.m., the SWAT team ordered Zinda to exit the home.[6] The other occupants also were ordered to exit the home, including Pacheco, his four young children, and his girlfriend who was pregnant. Pacheco was placed into custody at approximately 3:22 a.m.[7] Rather than continuing their investigation in the cold, the task force took everyone to a nearby church. Pacheco's ex-wife picked-up the children and Pacheco was transported to the Salt Lake City Police Department

---

[1] Hearing Tr., 10:3–12 (Dec. 15, 2010) (Dkt. No. 121).

[2] *Id.* at 10:12–13.

[3] *Id.* at 11:8–25, 12:21–22.

[4] *Id.* at 11:22–23.

[5] *Id.* at 11:25–12:4.

[6] *Id.* at 13:21–22. The SWAT team from the Salt Lake City Police Department elected to call individuals out of the house rather than entering it because the perceived risk of entering the house was high. *Id.* at 13:21–14:5.

[7] *Id.* at 14:25–15:2.

about one or one-and-a-half hours after he was taken into custody.[8]  He arrived at the station at approximately 5:00 a.m.[9]  He was then left alone in an interview room with a bottle of water and a blanket.  Because it was a holiday week-end and staff was short, Pacheco slept for about three hours in the room before members of the task force started to interview him.[10]  In the meantime, Zinda also was being interviewed by Detective Wendelboth and the FBI and police were conducting a search of Pacheco's house.[11]

During the search, police found a firearm buried in the ashes of a fireplace, along with a bank bag and wallets from the victim of the January 17th robbery.[12]  At other locations in the house and the occupants' vehicles, the police located rolled coins, masks, and other clothing items that matched the description of the robbers' apparel.[13]  Daniel Dunn, a special agent with the FBI then left Pacheco's house and went to interview Pacheco.  The interview began at about 7:45 a.m. in the morning and Detective Bolter, from the Salt Lake City Police Department, also was present and led the interview.[14]

At the start of the interview, the following exchange occurred:

Detective:   I got to advise you of your rights, because you do have rights, you

---

[8] *Id.* at 18:13–16.

[9] *Id.* at 19:10–13.

[10] *Id.* at 7:5–7, 19:18–20:6.

[11] *Id.* at 20:22–21:2, 21:22–24.

[12] *Id.* at 22:11–20.

[13] *Id.* at 22:20–23:1.

[14] *Id.* at 23:21–24:4.

know that right? Okay. First and foremost you have the right to remain silent, okay? *Anything* you tell me, I am going to put in the police report. That police report can be used in a court of law at a later date and time if need be, you understand that, right?

Mr. Pacheco: Yeah.

Detective: You have the right to an attorney. If you can't afford one, the state gives you one free of charge, you know that, right?

Mr. Pacheco: Yeah.

. . . .

Detective: So having all that in mind, do you want to talk to us?

Mr. Pacheco: Yeah.[15]

When questioned about the robberies, Pacheco denied all involvement initially.[16] Pacheco was informed about some of the evidence against him and that he was looking at "12 counts of aggravated robbery," with a twenty-five-year minimum on each gun charge.[17] Pacheco continued denying involvement, however, in the robberies. About forty minutes into the interrogation, Pacheco was again told about the twenty-five-year minimum and more about the evidence.[18] About four minutes later, Pacheco admitted he had a gun and that he was not supposed to be in possession of

---

[15] Interview of John Pacheco, 4:6–25 (Jan. 18, 2009) (Pl's Ex. 1A) (emphasis added) (hereinafter "Pacheco Interview Tr.").

[16] *See id.* at 20:3–9.

[17] *Id.* at 26:20–22.

[18] Video Recording of Interview of John Pacheco, 1:01:00 (Pl's Ex. 1) (hereinafter "Pacheco Recording"). The interrogation was videotaped. The "1:01:00" refers to the time count on the tape. During the first eighteen minutes of the tape, Pacheco is alone and sleeping in the room. Those minutes have been excluded from the court's calculation of time in the above text.

a firearm.[19]

A little over an hour into the interview, the officers encouraged Pacheco to show remorse to help himself out. They stated we "can't make you any promises, but the federal prosecutor usually listens to our recommendation."[20] Agent Dunn then told Pacheco that he was working with another man who had committed twenty-three robberies, and that because he cooperated, they were "working out a deal for 25 years."[21] Detective Bolter continued the discussion about sentencing, and that under the "matrix system," his score was going to be "through the roof."[22] At about an hour and twenty minutes into the interview, Pacheco admitted that his brother had asked him to participate in the bank robberies, but Pacheco had told him "no."[23] About ten minutes later, however, Pacheco confessed he was involved in the January 17th robbery of the magazine store.[24]

The officers continued interrogating Pacheco for another hour after this, during which time Pacheco did not confess to involvement in the bank robberies. The officers then concluded the interrogation, and Pacheco asked to use the restroom.[25] The officers indicated they would send someone in to take him to the restroom, and they left the room. In total, their interrogation lasted

---

[19] Pacheco Interview Tr., 35:24–36:6.

[20] *Id.* at 48:25–49:1.

[21] *Id.* at 49:4–7.

[22] *Id.* at 50:1–13.

[23] Pacheco Recording, 1:36:40 (Pl's Ex. 1).

[24] *Id.* at 1:44:35.

[25] *Id.* at 2:48:46; Pacheco Interview Tr., 92:16–23 (Pl's Ex. 1A). Although the interview transcript does not reflect that Pacheco asked to use the bathroom, the video recording shows this request was made.

approximately two-and-a-half hours.

Ten minutes later, without Pacheco having been taken to the restroom, Detective Wendelboth entered the interview room and started his interrogation of Pacheco. Detective Wendelboth introduced himself as being from the FBI and he told Pacheco that he had just "*offered [Zinda] his deal*."[26] Detective Wendelboth informed Pacheco he had had him under surveillance, knew his activities, and he provided some details of those activities. He then told Pacheco he was looking at the following:

> [T]hree life sentences. It's 250 years, minimum mandatory. The judge cannot deviate from the charge, whatever we decide to indict. *I can indict one, or I can indict ten*. So that's where I'm sitting right now. Where I fall somewhere in there is kind of up to you, and I'm leaving that up to you.[27]

About two minutes later, Detective Wendelboth further stated he needed

> to kind of decide if I think you need to be locked away for basically the rest of your life, or if I think that there's some chance that you have remorse because this is what the judges look for. . . . There's a point system in the federal system, and basically *I'm the first point of judging that*. And then *I'm going to indict* you basically based on that. I already have a US attorney on board. We screened this case last week. It was ready to go. You guys kind of forced our hand with this pawn shop robbery last night. Not a big deal. Not necessarily a

---

[26] Pacheco Interview Tr., 93:16–18 (emphasis added). Detective Wendelboth is employed by the Salt Lake City Police Department, but is "cross-deputized" to work on an FBI task force. Hearing Tr., 70:19–71:4.

[27] Pacheco Interview Tr., 95:6–11 (emphasis added); Pacheco Recording, 3:01:00 (Pl's Ex. 1). Throughout the interview transcript, "indict" is spelled "indite." The quotes in this decision incorporate a corrected spelling. Additionally, the last line of this particular quote is taken from the video recording rather than from the transcript. Besides noting the language used during the interrogation, it bears mentioning that Detective Wendelboth also used hand gestures to visually show the difference between one count versus ten counts and the intervals that exist between the two. *See* Pacheco Recording, 3:01:20.

federal case because its (sic) not really—*I can charge it* under a Hobbs Act robbery and make it a federal case, but again I'm putting this on you. It's really up to you. It's where you want to go with it. *Do you want to get out and see your kids grow up, or do you want them for the rest of their lives, basically, and your life, to come and visit you through glass.* It's kind of up to you.[28]

Detective Wendelboth then mentioned a few more details of the robberies and told Pacheco he did not want to hammer him. Pacheco tearfully replied that he had "let everybody down, even [his] own kids."[29] Detective Wendelboth said he understood why Pacheco would do it, and then eight minutes into his interrogation, Detective Wendelboth stated the following:

> I don't want to hammer you. *I gave Kenny a deal. I shook his hand on a couple things*. I said I wouldn't go after his wife. I won't go after yours. I know a lot of money was used to pay bills basically, and by statute, *anyone that receives proceeds from an illegal activity I can technically go after. . . . And* you know *if you're ex wife, your kids, house you're in benefitted from those proceeds technically I can go after them*. I don't want to. But it's something I can play. And that's something you can kind of protect your family from now, . . . it's something you can shelter from now so they don't lose their cars and don't lose the stuff that's going to help them now. . . . I can go in and seize basically anything that I think that would have been a payment used to make on the cars, or the house and all that stuff.[30]

Detective Wendelboth then encouraged Pacheco to confess so he could "go to the AUSA and say I think he's remorseful. We don't need to charge him with every single one of these. Let's charge him with one – you will get charged. Let's charge him with one."[31] Pacheco then began his confession of the bank robberies approximately eleven minutes after Detective Wendelboth began

---

[28] Pacheco Interview Tr., 96:19–97:11 (emphasis added).

[29] *Id.* at 99:4–5; Pacheco Recording, 3:07.00.

[30] Pacheco Interview Tr., 99:23–100:15 (emphasis added).

[31] *Id.* at 100:18–21.

interrogating him.[32] Detective Wendelboth's interrogation lasted about forty-five minutes. After it concluded, Pacheco was taken to the restroom.[33]

Following his confession, Pacheco was charged with eight counts for armed bank robbery, three counts for a Hobbs Act violation, including one for the January 17th armed robbery, and eleven counts for illegal possession of a firearm, for a total of twenty-two counts.[34] Pacheco contends he was not properly informed of his Miranda rights and that his will was overborne due to the promises and threats made by Detective Wendelboth. Pacheco submitted a neuropsychological report in further support of his contention. According to the report,

> Given Mr. Pacheco's personality make-up that includes marked fears of abandonment, marked fears of rejection, over sensitivity to criticism, and a self-esteem that depends heavily on the closeness and success of his close relationships, his personality make-up could have made him vulnerable to coercion and contributed to subsequent incriminating statements that he may have made.[35]

The government did not provide evidence to refute the report.

## ANALYSIS

**I.     STANDARD OF REVIEW**

The government "bears the burden of proving, at least by a preponderance of the evidence, the *Miranda* waiver."[36] It also "bears the burden of showing, by a preponderance of the evidence,

---

[32] Pacheco Recording, 3:11:13.

[33] *Id.* at 3:46:00.

[34] *See* Indictment (Dkt. No. 10).

[35] Beverly O'Connor, Ph.D., Neuropsychological Evaluation, 16 (Sept. 10, 2010) (Def's Ex. A). Ms. O'Connor is a licensed psychologist and a clinical and forensic neuropsychologist.

[36] *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004) (citation omitted).

that a confession is voluntary."[37]

## II. MIRANDA WARNING

### A. Content of a *Miranda* Warning

In *Miranda*, the United States Supreme Court found that custodial interrogations have an inherent coerciveness that "heightens the risk that the privilege against self-incrimination will not be observed."[38] To reduce this risk, the Court held "that the accused must be adequately and effectively apprised"[39] of the following rights:

> He must be warned prior to any questioning that he has the right to remain silent, *that anything he says can be used against him in a court of law*, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.[40]

Importantly, "no talismanic incantation is required to satisfy [*Miranda*'s] strictures."[41] Thus, courts "need not examine *Miranda* warnings as if construing a will or defining the terms of an easement."[42] Instead, "[t]he inquiry is simply whether the warnings reasonably convey to a suspect

---

[37] *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006) (citing *Seibert*, 542 U.S. at 608 n.1).

[38] *Seibert*, 542 U.S. at 608 (quotations and citation omitted).

[39] *Id.* (quotations and citation omitted).

[40] *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259 (2010) (quotations and citation omitted) (emphasis added).

[41] *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (quotations, citation, and alteration omitted).

[42] *Id.*

his rights as required by *Miranda*."[43] In other words, "warnings that convey the substance of the suspect's rights are sufficient."[44]

**B.     Waiver of Rights**

Once a person has been notified of his rights, he may elect to waive them. To be valid, a waiver "must be given voluntarily, knowingly, and intelligently."[45] "A waiver is knowing and intelligent only if it was made with 'a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"[46] This does not mean that a defendant must "understand all the consequences of the waiver."[47] Rather, "[h]e need only understand his right to remain silent or have his statements used against him."[48]

Here, Pacheco does not contend his waiver was involuntary. Instead, he contends that it was not knowing or intelligent because Detective Bolter did not tell him "anything you say can be used against you in court." Moreover, Pacheco contends he was misinformed that a police report could be used in court. While it may be incorrect that the police report can be used at trial, the focus of a *Miranda* inquiry is on whether a defendant was substantively informed that if he gave up his right to remain silent, anything he said could be used against him in court. The *Miranda* warning was less

---

[43] *Id.* (quotations, citation, and alteration omitted).

[44] *United States v. Brown*, 100 Fed. Appx. 769, 773 (10th Cir. 2004) (quotations and citation omitted).

[45] *United States v. Minard*, 208 Fed. Appx. 657, 660 (10th Cir. 2006) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).

[46] *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

[47] *Id.* (citing *Colorado v. Spring*, 479 U.S. 564, 574 (1987)).

[48] *Id.*

than ideal in this case. Nevertheless, Detective Bolter's incorrect statement does not void the substantive meaning of his warning. Hence, the court concludes Pacheco was sufficiently warned of his rights and the potential consequences of speaking.

## III.   VOLUNTARINESS OF CONFESSION

Pacheco contends that even if the *Miranda* warning was sufficient, his confession to Detective Wendelboth must be suppressed because it was involuntary. In a plurality decision, the Supreme Court stated "maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina."[49] Indeed, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare."[50] Because the court has found that Pacheco was sufficiently warned of his rights and that he voluntarily waived them, Pacheco now faces a significant hurdle.

"The determination of voluntariness is based on the totality of the circumstances. Relevant circumstances embrace both the characteristics of the accused and the details of the interrogation."[51] Notably, "[i]nvoluntariness in the context of . . . confessions requires a finding of coercive police action."[52] "The essence of voluntariness is whether the government obtained the statements by

---

[49] *Seibert*, 542 U.S. at 609.

[50] *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984).

[51] *Lopez*, 437 F.3d at 1063 (quotations and citations omitted).

[52] *Minard*, 208 Fed. Appx. at 660 (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (stating "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause")).

physical or psychological coercion such that the defendant's will was overborne."[53] "[B]ecause [Pachecho's] personal characteristics are relevant only if this court first concludes that the officers' conduct was coercive," the court looks at the details of the interrogation first.[54]

### A. Promises of Leniency

"Under Supreme Court and Tenth Circuit precedent, a promise of leniency is relevant to determining whether a confession was involuntary . . . ."[55] The Supreme Court has recognized that when individuals are "in custody, alone and unrepresented by counsel," they are "sensitive to inducement" by promises of leniency.[56] Not all promises, however, are coercive. Courts have held that an officer may make a promise to talk with a prosecutor and recommend leniency.[57] An officer may even speculate that such "cooperation will have a positive effect."[58] Because such statements are mere "limited assurances," they are permissible.[59] Statements, however, that go beyond limited assurances can "critically impair a defendant's capacity for self-determination."[60]

---

[53] *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1153 (10th Cir. 2006) (quoting *United States v. Rith*, 164 F.3d 1323, 1333 (10th Cir. 1999)) (quotations omitted).

[54] *Lopez*, 437 F.3d at 1064 (quotations and citation omitted).

[55] *Id.* (quotations and citation omitted).

[56] *Brady v. United States*, 397 U.S. 742, 754 (1970).

[57] *See e.g.*, *United States v. Wiley*, 132 Fed. Appx. 635, 640 (6th Cir. 2005) (citing *United States v. Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988); *United States v. Westbrook*, 125 F.3d 996, 1005–06 (7th Cir. 1997)).

[58] *Id.* (quotations and citations omitted).

[59] *See Lopez*, 437 F.3d at 1065 (citation omitted).

[60] *Id.* (citation omitted).

In *Lopez*, the defendant received and waived his *Miranda* rights. Two federal agents then questioned him about a murder. During the interrogation, one of the agents wrote "mistake" on a piece of paper and "murder" on another piece.[61] He "asked Lopez to make a choice" between the two.[62] On two other sheets of paper, the agent wrote "6" on one piece and "60" on another.[63] The agent then told Lopez, "if you cooperate, you know, . . . you *could* be looking at six years. And if you don't cooperate and give us answers, you *could* be looking at 60 years."[64] Although the agent never promised that Lopez's confession would, in fact, reduce his sentence, the Tenth Circuit Court of Appeals concluded that the agent's statements went beyond mere "limited assurances" and constituted promises of leniency.[65] When combined with the fact that the agents misrepresented the evidence,[66] the court held that Lopez's confession was involuntary.

Here, Detective Wendelboth did not use pieces of paper during the interrogation. He did say, however, that he had made a deal with Zinda and they shook hands on it. He then implied that he had the power to make a deal with Pacheco if he confessed. Moreover, Detective Wendelboth made repeated improper use of the word "I" during the interrogation. He said I can charge you with one count or I can charge you with ten; I am the first point in judging in the federal system; I am going

---

[61] *Id.* at 1061.

[62] *Id.*

[63] *Id.*

[64] *Id.* (emphasis added).

[65] *Id.* at 1065 (citations omitted).

[66] The Tenth Circuit noted, "[i]t is well-settled that a confession is not considered coerced merely because the police misrepresented to a suspect the strength of the evidence against him." *Id.* (quotations and citation omitted). Instead, it is just one factor to consider in the analysis.

to indict you; I already have a US attorney on board; and I can charge the January 17th robbery under the Hobbs Act. Besides these statements, Detective Wendelboth conveyed to Pacheco that he was leaving it up to him to decide whether to confess so he could avoid a life sentence and get out to see his children grow up. The import of these statements is that Pacheco would have reasonably understood that Detective Wendelboth had the authority to make a deal, that he would decide what counts to charge based on the level of Pacheco's cooperation, and that if Pacheco confessed he would not receive a life sentence.

Although Detective Wendelboth did briefly mention that he would go to the AUSA, his comment was insufficient to clarify that he had no authority to make a deal with Pacheco and that he only would be making a recommendation to the AUSA. The court therefore concludes Detective Wendelboth's statements were not mere "limited assurances," but promises of leniency that could result in a coerced confession.

### B. Threats

Besides promises of leniency, threats also can undermine the voluntariness of a confession. This is particularly so when the threat is against a defendant's family.[67] Statements that merely inform a defendant about action that can be taken legitimately against a family member may be permissible. When a statement is designed to overcome a person's "resolution *not* to consent," by falsely informing a defendant about action that can be taken against a family member, it may be deemed coercive.[68]

---

[67] *United States v. Ivy*, 165 F.3d 397, 403–04 (6th Cir. 1998) (citations omitted).

[68] *Id.* (emphasis in original).

Here, Detective Wendelboth testified during the suppression hearing that he had no evidence Pacheco's ex-wife or children were involved in the robberies.[69] Zinda had informed Detective Wendelboth that some of the robbery proceeds had been used by Pacheco to pay child support.[70] Detective Wendelboth had no knowledge, however, whether money had been used to make car payments. Yet, during Pacheco's interrogation, Detective Wendelboth told Pacheco that he had promised not to go after Zinda's wife and he would not go after Pacheco's if he helped him out. Otherwise, "anyone that receives proceeds from an illegal activity I can technically go after."[71] He then indicated he could seize any property that he thought had benefitted from the illegal activity, including vehicles and other property that Pacheco's family had. Detective Wendelboth's statements implied he could go after both Pacheco's family and their property, which were not correct at the time they were made due to the lack of evidence against Pacheco's ex-wife and children. The court therefore concludes the statements were not made merely to provide Pacheco with information but to overcome his will not to confess.

The timing of Pacheco's confession supports the impact the promises of leniency and threats had upon Pacheco. For two-and-a-half hours, Pacheco denied involvement in all robberies except the one on January 17th. Yet, within about ten minutes from the time Detective Wendelboth began questioning Pacheco, he confessed. Thus, the timing of the confession supports that it was coerced.

---

[69] Hearing Tr., 100:6–24 (Dkt. No. 121).

[70] *Id.* at 100:25–101:5.

[71] Pacheco Interview Tr., 100:2–3 (Pl's Ex. 1A).

## C. Personal Characteristics and Other Factors

Because the court has found coercive police conduct, it must now look at Pacheco's personal characteristics and other relevant factors. Pacheco was thirty-one at the time of his confession. He has previously earned $60,000 a year due to a vocational skill and intended to go back to school. Pacheco also has had prior "experience with the criminal justice system" and had knowledge of his *Miranda* rights.[72] During the interrogation, each officers' demeanor remained calm and respectful. There was no display of weapons and Pacheco was given a blanket, water, and allowed to sleep while he waited in the interrogation room. These factors all weigh against Pacheco's confession being involuntary.

Pacheco was detained and interrogated, however, for a relatively long period of time. The SWAT team began calling people out of Pacheco's home at about 3:00 a.m. and Pacheco was taken into custody at about 3:22 a.m. The interrogation at the police station started at 7:45 a.m. and it lasted until approximately 11:15 a.m. Moreover, Pacheco was deprived of the restroom for about an hour, although it is unclear from the record that this was intentional rather than just an oversight. Finally, Pacheco has submitted evidence to show that his personality makes him more susceptible to coercion when threats are made against his family. These factors weigh in favor of Pacheco's confession being involuntary.

Looking at each of these factors, combined with the promises of leniency and threats, the court concludes that Pacheco's confession to Detective Wendelboth was involuntary. The court

---

[72] *See Lopez*, 437 F.3d at 1065 (citations omitted) (listing experience and knowledge of the law as relevant factors).

therefore suppresses that specific evidence.

## **CONCLUSION**

For the reasons stated above, the court GRANTS IN PART and DENIES IN PART Pacheco's motion to suppress.[73] The court concludes that Pacheco received an adequate *Miranda* warning, and thus, Pacheco's confession about possession of a firearm and the January 17th robbery was not involuntary. The court further concludes, however, that Pacheco's confession to Detective Wendelboth about the other robberies was coerced and involuntary. That evidence is hereby suppressed.

DATED this 12th day of May, 2011.

BY THE COURT:

_____
Clark Waddoups
United States District Judge

---

[73] Docket No. 95. The court also grants Pacheco's Motion for Leave to File Out of Time Motion to Suppress. (Docket No. 92.) The court denies as moot Pacheco's first Motion to Suppress. (Docket No. 93.)